W. W. WINDLE COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 9426-72.    Filed January 7, 1976.

*Raymond T. Mahon,* for the petitioner.
*Justin S. Holden,* for the respondent.

698

700

## OPINION

Petitioner first contends that it acquired the 3600 shares of common stock of Nor-West in 1961, and retained them until June 1970, solely for reasons germane to its business, and without any investment motive, and therefore the shares were not capital assets in petitioner's hands. As a result, petitioner argues, upon

the stock becoming worthless it is entitled either to an ordinary business loss deduction under section 165(a) [8] or an ordinary and necessary business expense deduction under section 162(a).[9]

Respondent asserts that the shares of Nor-West stock held by petitioner were capital assets in petitioner's hands because petitioner purchased the stock for an investment, or because petitioner was at least partially motivated to purchase the stock for investment reasons and such motive, however minute, taints the business purpose. Therefore, respondent argues, petitioner is entitled only to a capital loss upon the stock becoming worthless.[10]

We hold for respondent on the ground that, while petitioner's principal motive was to acquire a captive customer, it had a substantial subsidiary investment motive, which prevented it from being entitled to an ordinary loss.

Petitioner was in the business of processing and selling raw wool and other woolen materials used by the manufacturers of woolen cloth. During the 1950's the woolen textile industry in the United States was facing severe economic problems due primarily to increased competition from abroad. During this period approximately 27 woolen mills which had been customers of petitioner went out of business and petitioner's sales declined from $9.5 million in 1956 to $3 million in 1961.

One of petitioner's good customers, Portland Woolen Mills in Portland, Oreg., went out of business in 1960. After careful research, and after consultation with the former executives of Portland Woolen Mills and with the McMinnville Industrial Promotions, Inc., a business group in the Portland area devoted to bringing business into the McMinnville area, petitioner decided to organize an Oregon corporation to go into the woolen textile business on a smaller scale than that of Portland Woolen Mills. The new corporation, Nor-West, bought its equipment from

---

[8] All section references are to the Internal Revenue Code of 1954, as in effect during the year in issue.

Sec. 165(a) provides:

(a) GENERAL RULE.—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.

[9] Sec. 162(a) in relevant part provides:

(a) IN GENERAL.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, * * *

[10] The parties agree that the deductions in issue in this case are to be taken for petitioner's taxable year ended June 30, 1970, whether their character be capital or ordinary.

Portland Woolen Mills, and the McMinnville group built and leased to it a factory building. Seventy-two percent of the stock of Nor-West was purchased by petitioner, and 28 percent by McMinnville area individuals and businesses.

When petitioner purchased stock in Nor-West, it did not anticipate receiving dividends from Nor-West, but it did expect the business to grow and prosper and increase in value, while well recognizing the risk that it might not, in view of the generally depressed conditions in the woolen industry. It also expected Nor-West to buy all its wool inventory from petitioner at a profit to petitioner. The latter expectation was less speculative than the former, however, for as long as Nor-West could stay in business at all, even if it did not prove to be very profitable, it would be an assured captive customer. Petitioner's primary motive in investing in Nor-West was to obtain a captive customer. Its investment motive, while substantial, was secondary.[11]

Petitioner projected selling about $900,000 of inventory to Nor-West annually. Although petitioner never reached that level of sales, it did sell more than $2.3 million worth of inventory to Nor-West during its 9-year life. Although petitioner cannot calculate the exact profit it made on these sales, its gross profit percentage on sales during this period varied between 8.4 percent and 20.7 percent, and it estimated, we believe reasonably, that probably its net profit percentage to Nor-West was close to its gross-profit percentage since it had little added selling or administrative expense attributable to sales to a captive customer such as Nor-West. Based on sales projections, petitioner's pretax net profit would have been from around $75,600 to $186,300 per year from planned sales to Nor-West.

Petitioner projected that Nor-West would make a pretax profit of about $138,550 the first year and $220,320 the second year. Petitioner would have enjoyed 72 percent of these profits, or about $100,000 the first year and $159,000 the second. These projections make it impossible for us to find that there was no substantial investment motive. Had the projections been realized, Nor-West would have been a good investment. We cannot find that these projections were not significant in giving rise to the decision to acquire the Nor-West stock. And the testimony of

---

[11] The other shareholders of Nor-West may also have had mixed motives in purchasing their stock, since at least those in the McMinnville group were interested in seeing new businesses locate in the McMinnville area.

petitioner's witnesses does not appear to be to the contrary. No projections were apparently made for later years. While the anticipated profits with respect to petitioner's stock in Nor-West were comparable to its anticipated profits on sales to Nor-West, the confidence factor for the former was clearly much lower, particularly in view of the longrun decline in the woolen industry and serious concern regarding its longrun future. While the projections themselves do not establish conclusively that either motive predominates, the general factual background in this case, petitioner's willingness to bring in minority interests, and the uncontradicted and credible testimony convince us that a predominantly sales motive existed. In fact Nor-West experienced losses in all years except its fourth and fifth years. If petitioner had been primarily interested in Nor-West as an investment, it might well have pulled out sooner than 9 years down the road. But during this entire 9 years, as the sole seller of woolen inventory to Nor-West, petitioner was enjoying annual profits on those sales and was actively seeking ways to increase Nor-West's own sales and turn the company into a viable business. We conclude that by 1967 any substantial thought of Nor-West as a hopeful investment opportunity had disappeared, and subsequent advances to Nor-West were made solely to keep it in being as a captive customer. At best, the hope was that it could be made to break even and repay the advances.

We were impressed with the credibility and demeanor of petitioner's witnesses. Their statements of their subjective motives generally coincide with the objective facts in this case. On the basis of the entire record we have found that petitioner's predominant motive in acquiring Nor-West stock was to acquire a captive customer, and that its secondary reason was to make an investment in a business it expected to succeed and grow.

Having reached these factual conclusions, we next look to the state of the law. It has become well-established that the term "capital assets" excludes items in addition to those specifically excluded from the term "capital asset" as defined in section 1221.[12] In *Corn Products Refining Co. v. Commissioner,* 350 U.S.

---

[12] Sec. 1221 provides:

For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

    (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of

46 (1955), the Supreme Court, in holding that corn futures contracts the taxpayer purchased and sold were not capital assets, stated:

Admittedly, petitioner's corn futures do not come within the literal language of the exclusions set out in [sec. 117(a)].[13] They were not stock in trade, actual inventory, property held for sale to customers or depreciable property used in a trade or business. But the capital-asset provision of § 117 must not be so broadly applied as to defeat rather than further the purpose of Congress. *Burnet* v. *Harmel,* 287 U.S. 103, 108. Congress intended that profits and losses arising from the everyday operation of a business be considered as ordinary income or loss rather than capital gain or loss. The preferential treatment provided by § 117 applies to transactions in property which are not the normal source of business income. It was intended "to relieve the taxpayer from * * * excessive tax burdens on gains resulting from a conversion of capital investments, and to remove the deterrent effect of those burdens on such conversions." *Burnet* v. *Harmel,* 287 U.S. at 106. Since this section is an exception from the normal tax requirements of the Internal Revenue Code, the definition of a capital asset must be narrowly applied and its exclusions interpreted broadly. This is necessary to effectuate the basic congressional purpose. This Court has always construed narrowly the term "capital assets" in § 117. See *Hort* v. *Commissioner,* 313 U.S. 28, 31; *Kieselbach* v. *Commissioner,* 317 U.S. 399, 403. [350 U.S. at 51-52.]

The *Corn Products* doctrine has since been applied in many situations by this Court and others, including situations involving the purchase of securities in another corporation. The issue on which the cases turn is whether the securities were purchased not for investment, but for business reasons. As stated

---

his trade or business;

(2) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 167, or real property used in his trade or business;

(3) a copyright, a literary, musical, or artistic composition, a letter or memorandum, or similar property, held by—

(A) a taxpayer whose personal efforts created such property,

(B) in the case of a letter, memorandum, or similar property, a taxpayer for whom such property was prepared or produced, or

(C) a taxpayer in whose hands the basis of such property is determined, for purposes of determining gain from a sale or exchange, in whole or part by reference to the basis of such property in the hands of a taxpayer described in subparagraph (A) or (B);

(4) accounts or notes receivable acquired in the ordinary course of trade or business for services rendered or from the sale of property described in paragraph (1); or

(5) an obligation of the United States or any of its possessions, or of a State or Territory, or any political subdivision thereof, or of the District of Columbia, issued on or after March 1, 1941, on a discount basis and payable without interest at a fixed maturity date not exceeding one year from the date of issue.

13 Sec. 117(a) is the predecessor of sec. 1221.

in *Booth Newspapers, Inc. v. United States,* 303 F. 2d 916, 921 (Ct. Cl. 1962):

if securities are purchased by a taxpayer as an integral and necessary act in the conduct of his business, and continue to be so held until the time of their sale, any loss incurred as a result thereof may be fully deducted from gross income as a business expense or ordinary loss. If, on the other hand, an investment purpose be found to have motivated the purchase or holding of the securities, any loss realized upon their ultimate disposition must be treated in accord with the capital asset provisions of the Code.

*Booth Newspapers* involved the purchase of stock of a paper mill company to assure the taxpayers a supply of newsprint at a time when there were serious shortages of such paper. See also *Electrical Fittings Corp.,* 33 T.C. 1026 (1960), and *FS Services, Inc. v. United States,* 413 F. 2d 548 (Ct. Cl. 1969), other cases where the taxpayer purchased stock in a company in order to assure a source of supply, and such stock was held to be a noncapital asset.

Other applications of the *Corn Products* principle are found in *Schlumberger Technology Corp. v. United States,* 443 F. 2d 1115 (5th Cir. 1971) (purchase of stock and loans to new company to obtain services of certain individuals); *Chemplast, Inc.,* 60 T.C. 623 (1973), affd. in an unpublished opinion (3d Cir. 1974) (loans to new corporation to acquire services of a particular individual); *Steadman v. Commissioner,* 424 F. 2d 1 (6th Cir. 1970), affg. 50 T.C. 369 (1968), cert. denied 400 U.S. 869 (1970) (advance of funds to a corporation by an attorney to protect his position as its secretary and general counsel); *John J. Grier Co. v. United States,* 328 F. 2d 163 (7th Cir. 1964) (purchase of stock in order to safeguard rights under a lease covering premises used for a restaurant business); *Commissioner v. Bagley & Sewall Co.,* 221 F. 2d 944 (2d Cir. 1955), affg. 20 T.C. 983 (1953) (loss on Government bonds acquired for deposit in escrow to discharge a contract obligation); *International Flavors & Fragrances Inc.,* 62 T.C. 232 (1974), revd. and remanded 524 F. 2d 357 (2d Cir. 1975) (gain on sale of pound-sterling short-sale contract, used to hedge investment in British subsidiary).

The case primarily relied upon by petitioner is *Waterman, Largen & Co. v. United States,* 419 F. 2d 845 (Ct. Cl. 1969), cert. denied 400 U.S. 869 (1970). The taxpayer in that case was a commission sales agent for various woolen mills. One such mill, which paid taxpayer about $25,000 per year in commissions, was about

to go out of business in 1959 because of the economic problems then affecting the woolen industry. The corporation which operated the mill was reorganized in South Carolina where there was a better labor market, and taxpayer was offered a chance to act as exclusive sales agent for all the woolen products of the reorganized corporation if the taxpayer would invest $100,000 in the capital stock of the reorganized corporation. The taxpayer made the investment in the hopes it could earn annual sales commissions of $60,000 from the new corporation. However, the woolen industry continued to experience difficulties and the taxpayer made only very small commissions before finally selling out its interest in the reorganized corporation for $25,000. The taxpayer claimed a $75,000 ordinary deduction, which the Court of Claims sustained. See also *Hagan v. United States,* 221 F. Supp. 248 (W.D. Ark. 1963) (salesman purchased stock in customer's business to continue an exclusive purchases arrangement), and *Southeastern Aviation Underwriters, Inc.,* 25 T.C.M. 412, 35 P-H Memo. T.C. par. 66,075 (1966) (aviation insurance manager purchased shares in insurance company to obtain an aviation insurance management contract like the one on which taxpayer had previously earned substantial commissions).

But, respondent argues, if petitioner has any investment motive at all, even a subordinate motive, such motive taints the business nature of the transaction, and the stock is a capital asset, citing *Dearborn Co. v. United States,* 444 F. 2d 1145 (Ct. Cl. 1971); *Duffey v. Lethert,* 11 AFTR 2d 1317, 63-1 USTC par. 9442 (D. Minn. 1963), and *Midland Distributors, Inc. v. United States,* 481 F. 2d 730 (5th Cir. 1973).[14] While the latter two cases recognize that there can be mixed motives in a taxpayer's acquiring stock in another corporation, that is, investment motives and business motives, there was no question that the predominant motive in each case, if not the sole motive, was an investment motive. However, in *Dearborn Co.* the Court of Claims found that the parent corporation, a furniture seller, purchased stock in a wood raw materials supplier for two reasons: (a) It intended to operate the supplier as a permanent, profitable

---

[14] Respondent's position here appears inconsistent with that expressed in Rev. Rul. 75-13, 1975-2 I.R.B. 6, in which respondent states that the issue is "whether the taxpayer purchased and held the stock with a *predominant* business motive as distinguished from a *predominant* investment motive." (Emphasis added.)

business in its own right, to receive dividends on its stock, and to earn management fee income, all found to be investment motives; and (b) it sought to acquire a source of raw materials needed in its subsidiary's business of manufacturing furniture, a business purpose. The Court of Claims concluded that because the parent was motivated by a substantial investment motive, the stock acquired was a capital asset in the taxpayer's hands, even though the principal reason for acquiring the stock was to acquire the company's supply and production facilities, a business purpose. The Court found investment purpose in the following facts: no premium over fair market value was paid for the stock; the investment was permanent rather than temporary; and an investment profit was anticipated. In the more recent decision of *Agway, Inc. v. United States,* 524 F. 2d 1194 (Ct. Cl. 1975), the Court of Claims, relying on *Dearborn,* upheld a taxpayer's claim to capital gain treatment on the redemption of preferred stock in an agricultural cooperative. The court, speaking by Judge Nichols, refused to apply the *Corn Products* doctrine, and suggested that "*Corn Products* has been applied in lower courts in a variety of situations which possibly might surprise the *Corn Products* court." *Agway, Inc. v. United States,* 524 F. 2d at 1200. In *Agway,* there was a substantial investment motive as well as the need to acquire a source of supply. The Court of Claims stated that "*Corn Products* will be applied in this Court to purchases of company stock to obtain a source of supply, *only if there is no substantial investment intent."* (Emphasis added.) *Agway, Inc. v. United States,* 524 F. 2d at 1201.

Despite the recent date of the *Agway* decision, and its reliance on *Dearborn,* the point of view there expressed is apparently controverted by another Court of Claims decision released the same day, *Union Pacific Railroad Co., Inc. v. United States,* 524 F. 2d 1343 (Ct. Cl. 1975). In that case, the court held that stock in certain subsidiary railroad corporations did not constitute capital assets in the hands of the parent railroad corporation, because—

the acquisition of the stock cannot be treated as *a mere investment unrelated to the business operations* of the plaintiff. It was accomplished for an operating, business purpose and the stock was held as part of the operation of plaintiff's business as a railroad. [Emphasis added; 524 F. 2d at 1359.]

In dissent, Judge Nichols, the author of the *Agway* opinion, stated that the court had not applied the tests used in *Dearborn.*

He observed that the investment in the stock was intended to be permanent, and that the plaintiff had not met its burden of proof regarding the other tests (payment of a premium for the stock and expectation of investment profit). While not disputing the fact that the purchased railroads were integrated with the plaintiff's business operations, he would have found the stock to be a capital asset because of the plaintiff's failure to show the absence of a concurrent investment motive.

Analysis of *Union Pacific* is made somewhat more difficult because the trial judge, whose opinion on this point was adopted by the court, used language which taken out of context could be said to bespeak a finding of *absence* of investment purpose, rather than a mere finding of dominant business purpose.

If anything, the leases that followed confirm the conclusion *of business and not investment* purpose * * *. The plaintiff bought the stock to run the railroad *and not to make an investment* * * * [Emphasis added; 524 F. 2d at 1359.]

Despite this language, the nature of the test seemingly applied for capital asset status is "a mere investment unrelated to the business operations of the plaintiff," and there is no language in the opinion, other than the above generalization, negating an investment intent as well as affirming a business purpose. This leads us to conclude, with Judge Nichols, that the Court of Claims is currently of the view that the existence, or at least the dominance, of a substantial business purpose for a stock acquisition suffices to preclude capital asset status, whether or not there is a concurrent hope of investment gain. Thus *Union Pacific* casts serious doubt on the continued vitality of *Dearborn* in the Court of Claims, and seems inconsistent with *Agway*. Since *Union Pacific* was decided by the full court, with only Judge Nichols dissenting, it appears more authoritative than *Agway*. *Agway* was decided by a three-judge panel, with Judge Nichols writing the court's opinion, Senior Judge Durfee concurring in the result, and Judge Kashiwa (who was in the majority in *Union Pacific*) dissenting on this issue.

We are now called upon to decide the same legal question which has seemingly so troubled the Court of Claims: When both investment and business motives exist but the business motive predominates, does the predominant business motive determine the nature of the asset in the taxpayer's hands? Or, as respondent argues, does the presence of an investment motive, albeit

secondary, override the business motive for acquiring the stock? The investment here clearly had the *Dearborn* factors of permanence, lack of premium, and expectation of investment profit. On the premium question, 594 other investors paid the same per-share price as did petitioner.

There are persuasive arguments on either side of the question. At first blush it appears reasonable and in line with the resolution of analogous questions in other areas that the predominant motive for acquiring the asset should determine the character of the asset in the taxpayer's hands, and that if it is a business motive, the existence of a secondary investment motive should not make the asset a capital asset. Cf. *United States v. Generes,* 405 U.S. 93 (1972); *Malat v. Riddell,* 383 U.S. 569 (1966). Such an interpretation also seemingly gives effect to the Supreme Court's admonition that exclusions from the definition of capital asset should be broadly construed. *Corn Products Refining Co. v. Commissioner, supra* at 52. Moreover, in order to avoid giving taxpayers a "whipsaw" position, under which they could obtain ordinary loss treatment in the Court of Claims, and capital gain treatment here, we would be inclined (all other things being equal) to follow an unequivocal Court of Claims position.

On the other hand, we deal here with a judge-made addition to the statutory categories of noncapital assets, and we are not compelled by the case law to broaden such categories more than is required under a fair reading of *Corn Products* and other precedents. *Corn Products* dealt with commodity futures, not stock. Its doctrine has frequently been applied to shares of stock, and cases such as *Waterman, Largen & Co.* are fairly close on their facts to ours. However, as pointed out in *Agway, Inc. v. United States,* 524 F. 2d at 1201, *Waterman, Largen & Co.* did not involve a finding of the existence of any investment intent, and therefore is not directly in point.

Nor are our own precedents controlling, as in no reported decision have we yet squarely faced and ruled upon the mixed-motive situation. As pointed out, the Court of Claims cases are equivocal and recent Court of Claims authority can be cited for either proposition.

We are ultimately persuaded to hold that stock purchased with a substantial investment purpose is a capital asset even if there is a more substantial business motive for the purchase. There are

two basic reasons for this holding. In the first place, to expand the statutory exceptions to "capital assets" into a mixed-motive case will be greatly to enlarge the far more limited category of noncapital assets which would otherwise exist. We would thereby be even more greatly expanding the "gray area" of uncertainty and controversy. Taxpayers would be presented with enlarged opportunities to claim ordinary losses on unsuccessful investments and capital gains on successful ones. And they would be put to their proof by respondent with respect to their subjective intent upon claiming capital gains on disposition of a wide array of successful (albeit business-related) stock investments. For example, most investments in foreign subsidiaries, which usually have an important degree of business integration with their parents, would pass into the gray area. Where given a choice, we should rule on the side of predictability.

Secondly, in the last analysis, Congress has decided what is a capital asset, and there must be limits to the liberties we can take with the statutory language of section 1221. Words are not infinitely elastic. Giving full effect to the Supreme Court's admonition in *Corn Products* that the statutory exclusion from the definition of capital assets should be broadly construed, we nevertheless must read that in light of the close relation to inventory of the assets in question in that case.

As we move from inventory-related corn futures to a more traditional form of capital asset, such as stock, we should be more reluctant to be innovative in further broadening the domain of subjective analysis and unpredictability. Accordingly, we hold that where a substantial investment motive exists in a predominantly business-motivated acquisition of corporate stock, such stock is a capital asset.

The next question is whether the subsequent effective abandonment of any investment motive as hard times befell Nor-West will change the result. We hold that it will not. To determine otherwise would put the taxpayer with mixed motives in a "heads I win, tails you lose" position, under which a successful investment would give rise to a capital gain, an unsuccessful one to an ordinary loss. The net effect would be to provide for business-related corporate stock tax treatment similar to that which Congress provided in section 1231 for assets *other* than such

stock. We do not believe the *Corn Products* doctrine calls for such a result.[15]

Next we must consider whether the loans and accounts receivable payable to petitioner by Nor-West are debt or equity.[16] Whether loans and accounts receivable are debt or equity depends upon all the facts and circumstances. Among the tests we have applied here, and without reciting the familiar litany of case law on this issue, are the following:

(1) The debt-stock ratio of Nor-West was less than one-to-one, in that Nor-West had less debt than stock.

(2) The loans were made long after Nor-West was incorporated and only to furnish Nor-West with current operating capital, not to purchase capital assets.

(3) The loans were made solely by petitioner, and no loans were made by the other 594 shareholders, i.e., the loans were not proportionate to stock holdings.

(4) The loans were evidenced by interest-bearing promissory notes payable on demand. Interest due was in fact paid by Nor-West and included in petitioner's taxable income.

(5) Many of petitioner's loans to Nor-West were repaid, with the last repayment occurring on August 18, 1969.

(6) Petitioner's loans to Nor-West were secured by all Nor-West's assets, and petitioner in fact eventually foreclosed on its security.

(7) Petitioner's accounts receivable arose from credit sales of inventory to Nor-West, and petitioner, an accrual basis taxpayer, included all such sales in its taxable income in the years in which made.

Under the circumstances we conclude, and have found as a fact, that both the loans and accounts receivable were debt, not equity, and petitioner is entitled to a business bad debt loss with respect to each of them for the taxable year ended June 30, 1970.

*Decision will be entered under Rule 155.*

Reviewed by the Court.

---

[15] In the converse situation, stock which is originally purchased for a business purpose can become a capital asset when the business motive disappears, leaving pure investment intent for continued retention. E.g., *Missisquoi Corp.*, 37 T.C. 791 (1962). This result is not, however, inconsistent with the views we have expressed. It illustrates the fact that corporate stock is normally a capital asset, and that only where both original purpose of acquisition and the reason for continued retention are both devoid of substantial investment intent should the stock be treated otherwise.

[16] The parties agree that if the loans and accounts are debts, they are business debts (as opposed to nonbusiness debts) deductible under section 166(a).