JOHN P. HOLLINGSWORTH AND JEAN L. HOLLINGSWORTH, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1642–77.     Filed January 22, 1979.

*William S. Smith* and *Michael L. Campbell,* for the petitioners.

*Ronald M. Frykberg,* for the respondent.

WILES, *Judge:* Respondent determined a $8,850.68 deficiency

in petitioners' 1974 Federal income tax. The sole issue is whether petitioners may deduct, as ordinary loss under section 165(a),[1] $50,000 for a convertible subordinated note which became worthless in 1974.

## FINDINGS OF FACT

Some facts were stipulated and are found accordingly.

John and Jean Hollingsworth, husband and wife, were legal residents of Des Moines, Iowa, when they filed their 1974 original and amended returns with the Internal Revenue Service Center, Kansas City, Mo., and when they filed their petition in this case.

John Hollingsworth (hereinafter petitioner) was a founder of Mid-America Insurance Investors Corp. (hereinafter Mid-America), an Iowa corporation organized in April 1966. Mid-America and its subsidiaries engaged in the business of providing and underwriting special risk automobile insurance in Iowa. Petitioner served as president and as a director of Mid-America from 1966 until October 1974.

In April 1966, petitioner acquired 7,500 shares of Mid-America common stock for $15,000. On June 8, 1971, he purchased 10,000 Mid-America warrants which provided for the purchase of 10,000 shares of common stock at a price of $4 per share during a 5-year period.

On April 1, 1969, petitioner and Mid-America entered into a 5-year written employment agreement which provided, in part, for a salary of $25,000 per year and an annual bonus based upon a percentage of Mid-America's consolidated corporate net income before taxes. Petitioner's total compensation from Mid-America and subsidiaries for 1971 was about $41,000. Effective January 1, 1972, petitioner's salary was increased to $35,000. Effective June 7, 1972, the term of the employment agreement was extended to June 13, 1977.

At a December 14, 1971, meeting of Mid-America's board of directors, it was resolved that the company would cause its wholly owned subsidiary, United America General Agency, Inc. (hereinafter United), to enter into a partnership agreement with Insurance & Surety, Inc. (hereinafter I & S), to operate a

---

[1]Statutory references are to the Internal Revenue Code of 1954, as amended.

general insurance agency writing commercial bonds, general fire and casualty, and life insurance. At the meeting petitioner informed the board that it would be necessary to raise additional capital to enable United to become qualified to write insurance in States where the joint venture with I & S would conduct their insurance operations. It was therefore resolved that the company would authorize the issuance and sale of $1,650,000 in principal amount of 6½-percent convertible subordinated notes to mature December 31, 1986.

Pursuant to a note agreement, Mid-America sold all $1,650,000 of its registered 6½-percent convertible subordinated notes (hereinafter notes) prior to January 31, 1972. The notes were sold in minimum amounts of $25,000 to mostly directors, officers, and/or stockholders of Mid-America.

Prior to and at the time the notes were sold, Mid-America's financial condition was sound. It was experiencing growth, its trends were favorable, and it was meeting its goals and projections. Its prospects for the future were good.

The notes were convertible into Mid-America common stock at $5 per share at any time after the date of issuance of the notes until December 31, 1986. At the time the notes were issued, Mid-America's common stock was traded over-the-counter at approximately $5 per share.

The conversion feature was a favorable factor in the sale of the notes since an investor could convert the notes into stock upon a rise in the market value of Mid-America's stock. The successful sale of the notes permitted Mid-America to expand and grow, which in turn enabled the company to generate more earnings, all of which indicate the notes could be considered a good investment. At the time Mid-America's notes were being sold, petitioner anticipated that the market price of Mid-America's stock would increase over a period of time. The market price of Mid-America's stock did rise during 1972, reaching a high bid price of $16 per share.

On January 31, 1972, petitioner purchased a $50,000 6½-percent convertible subordinated note from Mid-America. He borrowed the money to purchase the note, executing a promissory note due July 28, 1972, with interest payable at the rate of 6½-percent per annum. Petitioner pledged the note of Mid-America as security for the loan. His purchase of the $50,000

note was a voluntary act. He was not told or required by Mid-America or its board of directors to purchase the note.

At the time of his purchase of the $50,000 note, petitioner's 7,500 shares of Mid-America stock had an approximate market value of $37,500 and his 10,000 stock warrants had a market value of approximately $10,000.

On July 28, 1972, petitioner purchased an additional $35,000 Mid-America note for $35,000 from a member of the law firm representing the company. Petitioner borrowed the entire purchase amount using the note as a security for the loan. On March 16, 1973, petitioner sold $5,000 of the note purchased on July 28, 1972, for $5,000. Petitioner did not try to sell any of the remaining notes held by him at any time.

After experiencing financial difficulties and severe losses with respect to its new California bonding operations, Mid-America ceased doing business in October 1974. As a result, the 6½-percent convertible subordinated notes of Mid-America acquired and held by petitioner became worthless during 1974. The parties stipulated that the Mid-America notes acquired and held by petitioner are "securities" as defined in section 165(g)(2)(C), in that they were issued in registered form.

In 1974, petitioner deducted his loss in connection with the $50,000 Mid-America note as an ordinary employee business expense. The losses on his remaining $30,000 note purchased on July 28, 1972, his shares of Mid-America stock, and his warrants were deducted as capital losses. Respondent determined that petitioner's loss with respect to the $50,000 note of Mid-America was not deductible as an employee business expense. He further determined that $1,000 capital loss was allowable for 1974 and that petitioners were entitled to a long-term capital loss carryover of $47,250 with respect to the worthlessness of petitioner's notes, stock, and warrants of Mid-America.[2]

---

[2] The parties agree that petitioners are entitled to the following itemized deductions (in lieu of the standard deduction allowed in the statutory notice) in 1974:

| | |
|---|---|
| Medical insurance premiums | $60 |
| Taxes | 5,233 |
| Interest | 12,339 |
| Contributions | 599 |
| Miscellaneous | 24 |

The parties further agree that petitioners incurred additional medical and dental expenses totaling $685.

OPINION

We must determine whether petitioners are entitled to ordinary loss treatment with respect to their worthless $50,000 Mid-America note. The parties agree the note became worthless in 1974. The only issue, therefore, is the character of petitioners' loss.

Petitioners, relying upon *Corn Products Refining Co. v. Commissioner*, 350 U.S. 46 (1955), contend that the note was not a capital asset and, therefore, they are entitled to an ordinary loss under section 165(a). Respondent, relying on *W. W. Windle Co. v. Commissioner*, 65 T.C. 694 (1976), appeal dismissed 550 F.2d 43 (1st Cir. 1977), cert. denied 431 U.S. 966 (1977), asserts that petitioner's note was a capital asset and therefore they are entitled only to a capital loss under section 165(g)(1). We agree with respondent.

Section 165(g)(1) provides that if any security which is a capital asset becomes worthless during the taxable year, the resulting loss shall be treated as a loss from the sale or exchange of a capital asset; section 165(g)(2) provides that the term "security" includes a corporate note in registered form. The parties agree that petitioner's note is a "security" under this definition. Section 165(f) provides that losses from the sale or exchange of capital assets shall be allowed only to the extent allowed in sections 1211 and 1212. Section 1221 defines a capital asset.

Technically, since petitioner's note is not within any of the exceptions of section 1221, the literal language of that statute characterizes it as a capital asset; therefore petitioners' loss would be capital rather than ordinary and subject to the capital loss provisions of sections 1211 and 1212. Nevertheless, under the doctrine of *Corn Products Refining Co. v. Commissioner*, 350 U.S. 46 (1955), the sale or exchange of a corporate note may give rise to an ordinary rather than capital loss if the note was purchased and held as an integral act in the conduct of a taxpayer's business. *Booth Newspapers, Inc. v. United States*, 303 F.2d 916, 921 (Ct. Cl. 1962). Purchasing corporate stock or notes to protect one's source of income can be such a case. *Steadman v. Commissioner*, 424 F.2d 1 (6th Cir. 1970), affg. 50 T.C. 369 (1968), cert. denied 400 U.S. 869 (1970); *Electrical Fittings Corp. v. Commissioner*, 33 T.C. 1026 (1960); *Chemplast, Inc. v. Commissioner*, 60 T.C. 623 (1973).

Whether a corporate note, normally considered capital in nature, is an integral part of a taxpayer's business so as to render ordinary loss treatment is a question of fact, *Steadman v. Commissioner*, 50 T.C. 369, 379 (1968), affd. 424 F.2d 1 (6th Cir. 1970), cert. denied 400 U.S. 869 (1970), to be resolved by examining the taxpayer's motives for purchasing and holding the note. Where a substantial investment motive exists, even in a predominantly business motivated acquisition, the note is a capital asset. *W. W. Windle Co. v. Commissioner*, 65 T.C. 694 (1976), appeal dismissed 550 F.2d 43 (1st Cir. 1977), cert. denied 431 U.S. 966 (1977). Thus, to obtain ordinary loss treatment under section 165(a) for their Mid-America note, petitioners have the burden of proof to negate a substantial investment motive in purchasing and holding the note. *Welch v. Helvering*, 290 U.S. 111, 115 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.

Petitioner was an officer and director of Mid-America. In essence, he contends that he purchased and held a $50,000 Mid-America convertible subordinated note to protect his employment and to increase his bonus income. He alleges that Mid-America needed additional surplus to expand its insurance business into other States; that his salary, based in part upon the corporation's consolidated net income, would increase as a result of profitable business expansion; and that he felt an informal pressure from the remaining directors to purchase notes to protect his position.

After a careful review of the record in this case, we are convinced that petitioner purchased the $50,000 Mid-America note with a substantial investment motive, even though he also entertained business motives; that he retained this investment motive until the note became worthless in 1974; and that he is therefore entitled only to capital loss treatment.

At the time the $50,000 note was purchased, petitioner owned 7,500 shares of Mid-America stock valued at $37,500 and 10,000 stock warrants valued at about $10,000. As a result, petitioner had an investor's financial interest in seeing the company prosper. The successful sale of $1,650,000 in Mid-America notes was believed the key to allow the company to expand and prosper. This expansion would in turn enhance petitioner's investment position. His stock and warrants were expected to

and did, in 1972, increase in value following the successful sale of the notes.

We believe petitioner considered the note itself a good investment, even though he had to borrow to purchase it. First, he considered the note to have a relatively low risk since the note would be redeemed at maturity and he could use those proceeds to pay off the bank loan. The company was sound at the time of purchase and the interest on the bank loan and the note were matched. Second, the note was convertible into Mid-America stock at a price of $5 a share, the current market value of the stock at the time the notes were sold. Petitioner expected Mid-America stock to rise following the note sale. It did, reaching a high bid price of $16 per share in 1972.

As we view it, petitioner saw this note purchase as a no risk situation. If the stock value went up, as anticipated, the note could be converted at any time. If the stock value declined, he would simply turn in the note to the corporation at maturity. Petitioner testified he never intended to convert the note because he needed the cash proceeds to pay off the bank loan he made to purchase the note. This is not credible. If the stock soared over the $5 conversion price, any reasonable man would exercise his conversion privilege. If the bank would loan petitioner money to purchase a $50,000 note they certainly would honor the same loan for stock worth much more. Even if the bank wanted their loan repaid at the conversion, petitioner could have sold some of the inflated stock for the necessary funds.

Finally, this was not petitioner's only investment in Mid-America notes. On July 28, 1972, he purchased another $35,000 note. He testified that he purchased the note because he felt a moral obligation to help the seller since that person had originally acquired more notes than he wanted. Although this purpose is laudable, it seems unlikely that anyone would borrow $35,000 to purchase a note merely to aid another individual in liquidating a sound investment. Cast in its business setting, we believe petitioner made the subsequent purchase primarily because he believed the $35,000 note to be a good investment. This is further evidence of the fact that he felt the Mid-America notes to be a good investment, including his $50,000 note. Accordingly, we find that petitioner entertained an investment motive for purchasing and holding the $50,000 note and that this investment motive was substantial.

We do not doubt that petitioner had some business motive for purchasing the $50,000 note, such as to help increase his bonus income through business expansion. We have also considered petitioner's testimony that he felt an informal pressure to purchase the note to protect his position, although we are unconvinced by this testimony in lieu of the facts that he agreed that the purchase was a voluntary act and that he had a long-term employment contract through 1974 at the time of purchase. But these motives, even if strong enough to establish a predominant business motive for the purchase, do not negate the coexisting substantial investment motive which we have found. Accordingly, petitioners have failed their burden here to negate substantial investment motive in purchasing and holding the note under the *W. W. Windle & Co. v. Commissioner, supra,* standard.[3] Thus, petitioners' 1974 $50,000 loss is confined to capital loss treatment.

To reflect the foregoing,

*Decision will be entered under Rule 155.*

---

[3]We note that a subsequent abandonment of petitioner's substantial investment motive in purchasing the note will not alter this result. *W. W. Windle Co. v. Commissioner,* 65 T.C. 694, 713–714 (1976), appeal dismissed 550 F.2d 43 (1st Cir. 1977), cert. denied 431 U.S. 966 (1977), followed. In any event, we do not think petitioner ever altered his original investment motives for acquiring the $50,000 note.