EDWARD H. BOSEKER and YVONNE J. BOSEKER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Boseker v. Commissioner
Docket No. 27643-82.
United States Tax Court
T.C. Memo 1986-353; 1986 Tax Ct. Memo LEXIS 251; 52 T.C.M. (CCH) 70; T.C.M. (RIA) 86353; August 6, 1986. Howard M. Larsen, for the petitioners. Patrick E. McGinnis, for the respondent. COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: Respondent determined the following deficiencies in petitioners' Federal income taxes: Year
Deficiency
1978
$83,025
1979
7,993
1980
7,197
After concessions, the issues for decision are whether petitioners are subject to the limitations on investment interest deductions contained in section 162(d) [1] and whether petitioners are entitled to casualty loss deductions in 1978 and 1980 in excess of the amounts allowed *253 by respondent in his notice of deficiency. FINDINGS OF FACT Some of the facts have been stipulated. The facts set forth in the stipulation are incorporated in our findings by this reference. Petitioners Edward H. Boseker (petitioner) and Yvonne J. Boseker resided in Santa Ana, California, at the time their petition was filed. They filed joint Federal income tax returns in 1978, 1979, and 1980 with the Internal Revenue Service Center in Fresno, California. During the years in issue, petitioner was employed as a physician by Edward H. Boseker M.D., Inc. In or about June 1977, petitioner purchased the Erle Stanley Gardner Ranch (the Ranch), a land parcel of approximately 585 acres located in Riverside County, California, from an unrelated partnership (the "Burns Partnership") managed by Harry Burns (Burns). In January 1978, petitioner expanded the Ranch by purchasing an adjoining parcel of approximately 80 acres. As of August 20, 1985, the Ranch include approximately 650 acres. The upland area of approximately 312 acres *254 included foothills and hilly slopes of steeply rising sierra, portions of which are classed as rockland. Because of steep slopes, shallow depth to bedrock, lack of water, and rock float, the upland soils were considered, as of August 20, 1985, adaptable only to wildlife. Approximately 220 acres comprised the valley and valley terrace areas and were utilized for farming purposes. The soil in this area was regarded as good agricultural (and urban) soil. Farmstead areas occupied approximately 33 acres, and the Pechanga Creek bottom occupied approximately 16 acres. The Pechanga Creek was designated as riverwash, subject primarily to seasonal storm flows, and the Ranch was within the floodplain of the Pechanga Creek, i.e., the area into which the creek may overflow during flooding. The Ranch is accessible by county roads at several points. It borders an Indian Reservation as is located in an area with lengthy agricultural uses which, in the two decades preceding 1985, began to be replaced with suburban rural homesite uses. For instance, near the Ranch is Rancho California, a large development of numerous land divisions oriented to mixed uses including agricultural, single family *255 and multiple family residential, offices, commercial, and some industrial and manufacturing uses. At all relevant times, the Ranch was zoned "R-R" or Rural Residential, which permits all light agricultural uses including animal husbandry (maximum 5 animals per acre) and single family residential uses. The Burns Partnership purchased the Erle Stanley Gardner Ranch in or about 1975. Erle Stanley Gardner had used the Ranch primarily as a retrest and workshop for his writing. The Burns Partnership, however, intended to grow grapes for wine production on approximately 300 acres of the upper and lower flat areas of the Ranch. After extensive research, the Burns Partnership cleared approximately 80 acres in the upper levels, installed roads for access to the upper levels, installed a well and tanks for water, and purchased metal pipes and wire for the vines. Before any grapevines were planted, the wine market incurred a dramatic change, and the project became too risky for the Burns Partnership. The Burns Partnership began farming the property; hay was planted and a few cows and pigs were purchased. Subsequently, the Burns Partnership commenced a process of subdividing the property *256 with the intent of selling "small farms" or "ranchettes." A parcel map was prepared, and surveying and other engineering work were commenced.During this period, the Burns Partnership sold the Ranch to petitioner for $1,600,000, including certain payments of cash and an installment note for $1,400,000. As part of the consideration, petitioner paid $25,000 for some of the surveying and engineering projects begun by the Burns Partnership and completed or almost completed at the time of sale. The parties executed an Amended Trust Agreement (Trust Agreement) that was drafted by a trust officer pursuant to instructions by Burns. The Burns Partnership paid for the preparation of the 36-page Trust Agreement, which was similar to other trust agreements prepared for Burns. The Trust Agreement designated Security Title Insurance Company as Trustee and holder of legal title to the Ranch. The Trust Agreement described its purpose as follows: ARTICLE II -- PURPOSE
1.It is the intention of FIRST BENEFICIARY [the Burns Partnership] and SECOND BENEFICIARY [petitioner] that this trust is created and established for the following general purposes: (a) To, from time to time, subdivide *257 all or portions of the Trust Property. (b) To sell, lease or otherwise dispose of said property, it being presently contemplated that sales of subdivided portions of said property may be made to members of the general public * * *. * * * (d) To secure to the FIRST BENEFICIARY and the SECOND BENEFICIARY their respective rights and interests, as hereinafter defined and set forth. The Trust Agreement also numbered and described 20 subdivided parcels within the Ranch. If petitioner sold any portion of the Ranch property during the life of the trust, petitioner was required to pay the Burns Partnership the specified amount(s) corresponding to the particular parcel(s) sold. Although the Trust Agreement did not require or otherwise induce petitioner to sell any of the Ranch property and although Burns did not know what petitioner intended to do with the property, the purpose of these provisions was to protect the interests of the Burns Partnership. Before the sale was closed, petitioner received a letter from Burns dated July 18, 1977, requesting his approval of certain projects and activities currently in process. Specifically, it directed petitioner to designate "yes" or "no" *258 beside 22 items listed under the heading "Improvements & Work Planned by Present Owner"; petitioner would bear the expense of some of those items. Among the items in the list were a tennis court, a swimming pool, roads, farm equipment, vehicles, and trees to be planted. The letter also included the following paragraph: It was certainly nice meeting and talking to you on my recent trip and I know the resale will be a tremendous success and you will get much enjoyment from same as we have done over the past few years. Although petitioner left the list substantially unmarked, except tax bonds (yes), cultivation (no), pigs (yes), surveyor's bill (yes), and cash monument bond (yes), he did write and initial a notation at the bottom of the letter that he may purchase some of the vehicles and farm equipment. Petitioner employed a ranch manager, Jeffery Loefke (Loefke), who had also managed the farm for the Burns Partnership. Loefke suggested to petitioner that an avocado orchard or a vineyard might be feasible, and that there was sufficient water in the upper levels for the development of an orchard. Petitioner planted a test site of citrus and avocado. Petitioner purchased *259 substantial farm equipment and machinery, and he converted the tennis court into a hay barn. Approximately 220 acres of the property were devoted to hay farming, specifically oat hay and alfalfa hay, and approximately 40 acres were devoted to cattle grazing. Also, petitioner "cleaned up" and began to rent or lease a few homes located on the Ranch. Petitioner looked to others for farm and ranch consultations, including William McMillan (McMillan), who was paid $27,454 in 1978 and 1979.Among other things, McMillan advised petitioner to raise replacement heifers, grow oat hay, and to plant 40 acres of kiwifruit and 40 acres of Macadamia nut trees. Petitioner maintained certain records regarding the cattle operation on the Ranch in 1979, 1980, and subsequent years. The records included descriptions of the livestock, dates of purchase, dates of sale, and prices. Attached to the records are copies of checks to petitioner for cattle sales and copies of receipts for purchases and sales at cattle auctions. Petitioner maintained yearly summaries of production of oat hay and alfalfa hay commencing in 1980. Petitioner also maintained a separate bank account for the Ranch under the name *260 "Boseker Great Oak Ranch." Riverside County requires a seller of real estate to provide the purchaser with a "white paper," a document describing water availability, sewage, bus routes, electricity and other details a new owner of property would like to know. The white paper must be renewed periodically or it will expire. At about the time petitioner expanded the Ranch, he became concerned about his ability to make the large payments on the note; thus, petitioner had white papers prepared for 4 of the 20 parcels as a security measure in case he had to sell some of the Ranch property to make his payments. Petitioner, however, never sold or attempted to sell any of the parcels within the Ranch. Petitioner never renewed the white papers, and they subsequently expired. Because of severe storms, mudslides, and flooding on or ending on February 5, 1978, and January 8, 1980, President Carter declared several counties in California, including Riverside County, National Disaster Areas on those respective dates. See Rev. Rul. 78-440, 1978-2 C.B. 115; and Rev. Rul. 80-357, 1980-2, C.B. 64. As a result of the flooding on the Ranch, roads were washed out, fences *261 damaged, soil eroded, and debris accumulated. After examining the damage to the Ranch, a real estate broker sent a letter to petitioner on February 11, 1981, that included the following paragraph: I think that a satisfactory listing value of the property at this point in time would be 1.2 million dollars as I believe there is at least $400,000 in physical damage which must be repaired before the farm can be returned to a satisfactory working unit. In a letter dated March 8, 1981, a farming and consulting agent, Robert McKinley (McKinley), referred to "near total destruction" to six parcels and extensive damages to four parcels, all of which were involved in farming. McKinley offered several suggestions for restoration and for preventive measures. Further, McKinley estimated that it would cost petitioner approximately $300,000 over 4 to 5 years to restore the land. The following table describes the cost of restoration estimated by the Riverside-San Diego County Agricultural Stabilization and Conservation Service Office and the funds remitted to petitioner as part of a government sponsored cost-sharing program: 1978
Needed
Estimated Cost
Cost-Share Earned
Practice
of Restoration
(Paid to Petitioner)
Debris Removal
$12,874
$ 6,429
Releveling
12,280
8,000
Restoring Fence
1,300
724
Restoring Structure
1,300
1,040
(Dam Repair)
Total
$27,754
$16,193
*262 1980
Needed
Estimated Cost
Cost-Share Earned
Practice
of Restoration
(Paid to Petitioner)
Debris Removal
$10,000
$ 2,460
Grading & Releveling
6,000
4,260
Fence Restoration
2,000
820
Restore Structure
6,000
2,460
Total
$24,000
$10,000
On every form describing the cost-share earned for each needed practice, petitioner affirmed that he would bear all the expenses (except for program cost-sharing) for performing the practice. Petitioner expended a total of $8,691 to repair damages from the 1978 storm and $18,801.28 to repair damages from the 1980 storm. On Schedules F, Farm Income and Expenses, petitioners reported, among other things, interest expense deductions of $118,684, $119,000, and $107,100 and net farm losses of $201,086, $194,413, and $185,328 in 1978, 1979, and 1980, respectively. On separate schedules, petitioners reported casualty losses resulting from the floods of $37,944 and $50,000 in 1978 and 1980, respectively. In his notice of deficiency, respondent determined that with respect to the Ranch petitioners were subject to the limitations on investment interest and disallowed the interest expense deductions reported *263 on Schedules F in 1978, 1979, and 1980 in excess of the amounts determined allowable. Respondent also disallowed a portion of the casualty losses claimed in 1978 and 1980. By amendment to the petition, petitioners allege that the casualty loss in 1980 was $400,000. The value of the Erle Stanley Gardner Ranch was $1,325,000 on June 23, 1977; $1,425,000 on June 31, 1980; and $1,592,000 on June 31, 1985. OPINION The first issue for determination is whether the Ranch is investment property such that petitioners' indebtedness thereon would be subject to the limitations on investment interest deductions contained in section 163(d). Petitioners contend that they did not hold the property for investment but rather to operate it as a farm, i.e., to engage in a trade or business activity. Thus, petitioners argue that section 163(d) does not apply to the interest expenses on the installment note for the Ranch. Petitioners have the burden of proof. Rule 142(a), Tax Court Rules of Practice and Procedure.
*264 Section 163(a) generally allows "as a deduction all interest paid or accrued within the taxable year on indebtedness." Section 163(d), however, limits a deduction for interest incurred on investment indebtedness: (1) In general. -- In the case of a taxpayer other than a corporation, the amount of investment interest * * * otherwise allowable as a deduction * * * shall be limited, in the following order, to -- (A) $10,000 * * *, plus (B) the amount of the net investment income * * *. Section 163(d)(3)(D) defines "investment interest" as "interest paid or accrued on indebtedness incurred or continued to purchase or carry property held for investment." "Property held for investment," however, is not defined in section 163(d) or the regulations thereunder. For determining whether property was held for investment, we have identified the applicable test as whether there was "substantial investment intent" in the acquisition or retention of the property. Miller v. Commissioner,70 T.C. 448, 455 (1978). *265 See also W.W. Windle Co. v. Commissioner,65 T.C. 694 (1976). Although the issue in Miller arose under section 57, we noted that both sections 57 and 163(d) attempt to deal with the perceived abuse arising from the deductibility of interest paid on loans obtained to finance investments that will ultimately produce capital gains. Miller v. Commissioner,70 T.C. at 454 and 455. See also H. Rept. No. 91-413 (1969), 1969-3 C.B. 200, 245. The test in Miller, however, was articulated in terms of stock, which is normally a capital asset owned for investment purposes. Miller v. Commissioner,70 T.C. at 455. Although that test might be stricter than for property which is not normally a capital asset owned for investment purposes, we need not address this issue because of our determination that petitioners have nevertheless satisfied the test articulated in Miller.[2]
Based on our consideration of the *266 entire record, we conclude that petitioner did not have a substantial investment purpose in purchasing and holding the Ranch during the years in issue and is thus not subject to the limitations in section 163(d). Respondent argues that petitioner's dominant motive was investment. He contends that this conclusion is supported by the Trust Agreement, petitioner's payment of certain surveying costs, a letter from Burns, petitioner's white papers, the Ranch's location near a "booming residential subdivision," and the limited agricultural value of the property. Respondent also argues that under either the strong proof rule or the Danielson rule, petitioners have failed to introduce evidence that will overcome the intent of the parties as described in the Trust Agreement. The stricter rule of Danielson v. Commissioner,378 F.2d 771, 775 (3d Cir. 1967), vacating and remanding 44 T.C. 549 (1965), has not been adopted by this Court. See G S Services Corporation v. Commissioner,73 T.C. 406, 412 n. 2 (1979). Nor has it been applied in the Court of Appeals for the Ninth Circuit, to which this case may be appealed. See Throndson v. Commissioner,457 F.2d 1022, 1025 (9th Cir. 1972), *267 affg. 51 T.C. 306 (1968). The "strong proof" rule requires a taxpayer to present strong proof, i.e., more than a preponderance of the evidence, that the intended allocation of the purchase price is other than the allocation described in the contract. Major v. Commissioner,76 T.C. 239, 247 (1981). As respondent correctly points out, the strong proof rule has been applied in situations other than a challenged allocation of purchase price. See, e.g., Schatten v. Commissioner,746 F.2d 319 (6th Cir. 1984). The language in the Trust Agreement on which respondent relies, however, is merely a recital of intent and not an operative provision. Nevertheless, assuming but not deciding that the strong proof rule applies, we conclude for the reasons set forth in this opinion that petitioners have satisfied the requirements of that rule. Respondent relies heavily on the provision in the Trust Agreement that described its purpose in terms of subdividing and disposing of the property. Respondent alleges that the parties bargained for such language *268 and that it therefore manifested their mutual intent. There is no evidence, however, of such bargaining, and the testimony of the participants is to the contrary. The Trust Agreement was drafted in accordance with Burns' instructions, and its language generally mirrored other trust agreements prepared for Burns. The Trust Agreement in no way encouraged petitioner to sell parcels, and Burns testified that the division of the property into parcels (and affixed prices) simply secured the interests of the Burns Partnership. Moreover, Burns stated that he did not know what petitioner would do with the Ranch. Petitioner testified that he never intended to sell any parcels and that he wanted to farm the property. His testimony was credible and corroborated by his ranch manager and other witnesses and was consistent with his conduct. Petitioner hired a ranch manager, secured advice from farming consultants, purchased farm equipment, converted a tennis court to a hay barn, farmed the property by growing hay and raising livestock, and maintained certain records of the farming activities. Respondent also relies on the letter from Burns to petitioner dated July 18, 1977. It described *269 projects on the Ranch that petitioner may have wanted to continue and stated that "I know the resale will be a trememdous success." Even if this statement by Burns suggests an intent by petitioner to resell the property, and we are not convinced that it does, it is nevertheless outweighed by petitioner's affirmative action toward farming the property, his notation at the bottom of the letter that he may buy some of the farm equipment, and Burns' testimony that he did not know what petitioner would do with the Ranch. Moreover, petitioner has persuasively explained the reasons for the white papers, a security device in case petitioner was short of funds to make payment, and the $25,000 payment of engineering and surveying costs, a part of the consideration required by the seller. Also, the Ranch's mere proximity to a residential subdivision does not indicate an intent by petitioner to resell parcels, particularly in view of the objective factors and testimony heretofore discussed. Respondent contends that the agricultural value of the Ranch was limited because of low historical income, lack of adequate water, and environmental problems. Respondent's expert's report identified the *270 property's highest and best use as ranchettes or rural residential. This determination was based primarily on the zoning of the area, the nearby residential developments, the limited water supply, and the steep upland slopes. This argument is not persuasive; that an expert or, for that matter, any other individual might consider the property undesirable as a farm does not show that petitioner did not intend to farm the Ranch. In his brief in answer, respondent alternatively argues that petitioners' operation was a "hobby" under section 183. Petitioners object to respondent's asserting a new position on brief and argue that it violates the requirement of "fair notice of the matters in controversy" in Rule 31(a), Tax Court Rules of Practice and Procedure. We agree. Respondent did not raise the issue in his notice of deficiency, in his answer to the petition, or at trial. Because petitioner did not have the opportunity to present evidence on this issue, we do not consider it. See Seligman v. Commissioner,84 T.C. 191, 198-199 (1985), and cases cited therein, on appeal (5th Cir., Nov. 13, 1985). In any event, respondent's alternative argument is essentially inconsistent *271 with his position that the property was held for investment. See section 1.212-1(b), Income Tax Regulations.Interest otherwise deductible under section 163 is not limited by section 183. Respondent did not disallow other deductions relating to the Ranch, and it is those items that would not be allowed by the application of section 183(b)(2). The second issue for decision is whether petitioners are entitled to casualty loss deductions in 1978 and 1980 in excess of the amounts allowed by respondent in his notice of deficiency. The amount of a casualty loss deduction is generally computed as the fair market value of the property immediately before the casualty minus the fair market value of the property immediately after the casualty, not to exceed, however, the property's adjusted basis. Millsap v. Commissioner,46 T.C. 751 (1966), affd. 387 F.2d 420 (8th Cir. 1968); section 1.165-7(b)(1), Income Tax Regs. *272 The determination of these respective values "shall generally be ascertained by competent appraisal." Section 1.165-7(a)(2)(1), Income Tax Regs. As an alternative, the regulations allow the cost of repairs to the property as a measure of the casualty loss. Section 1.165-7(a)(2)(ii), Income Tax Regs. Petitioners admit that they have the burden of proving the amount of the casualty loss deductions. Heyn v. Commissioner,46 T.C. 302 (1966); Rule 142(a), Tax Court Rules of Practice and Procedure.
In support of the deductions they seek, petitioners argue that the fair market value of the Ranch declined as a result of the casualty. Petitioners rely on two letters and certain testimony. One letter, by a real estate broker, described a loss in value of $400,000. The other letter, by a farming consultant, estimated that satisfactory repairs would cost $300,000; however, petitioners admit that they are not seeking to prove cost of repairs as a measure of the damages. Although the drafters of these letters testified at trial, neither was qualified as an expert on appraisal or market valuation. Their statements were *273 unsupported and unpersuasive. Respondent's expert, whose report is a part of the record, determined the Ranch's value in 1977, 1980, and 1985 as approximately $1.3 million, $1.4 million, and $1.6 million, respectively. Petitioners have failed to satisfy their burden of proof. In his notice of deficiency, respondent allowed casualty loss deductions for 1978 and 1980 consistent with the estimated costs of restoration determined by the local Agricultural Stabilization and Conservation Service office. Because petitioners have failed to prove deductible losses in excess of those amounts, respondent's determinations as to the casualty loss deductions are sustained. We have considered other arguments of the parties, but because of our holding, we do not address them. Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue.↩
2. Petitioners argue that the use of the property assumed by respondent, i.e., subdivision and resale, would result in taxation at ordinary rates. Because of our holding, we need not address this argument.↩