LARRIMORE WRIGHT and MARY M. WRIGHT, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Wright v. Commissioner
Docket No. 21794-80.
United States Tax Court
T.C. Memo 1983-707; 1983 Tax Ct. Memo LEXIS 79; 47 T.C.M. (CCH) 422; T.C.M. (RIA) 83707; November 29, 1983. C. Richard Rayburn, Jr., for the petitioners. James R. Rich, for the respondent. KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION KORNER, Judge: Respondent determined deficiencies in petitioners' Federal income taxes for 1976 in the total amount of $57,829. After concessions, the issues for decision herein are as follows: (1) Whether petitioners' loss upon the sale of 10,000 shares of common stock of Texfi Industries, Inc. is deductible as an ordinary loss or a capital loss under section 165; [1] and/or (2) whether petitioners' loss upon the sale of said stock is deductible as an ordinary loss under section 83 and regulations thereunder. *82 FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation and the exhibits attached thereto are incorporated herein by this reference. Larrimore Wright (hereinafter referred to as "Petitioner") and Mary M. Wright, husband and wife (hereinafter referred to, collectively, as "petitioners"), were legal residents of Greensboro, North Carolina, on December 5, 1980, the time of filing of their petition herein. Petitioners filed a joint Federal income tax return for the tax year ending December 31, 1976, with the Internal Revenue Service Center in Memphis, Tennessee. Prior to October 1971, petitioner was employed as a partner in the national accounting firm of Price, Waterhouse & Company, where his annual salary was in the range of $70,000 to $75,000. Between July 1971 and October 1971, petitioner participated in negotiations with Joseph H. Hamilton (hereinafter referred to as "Hamilton"), who was then the president of Texfi Industries, Inc. (hereinafter referred to as "Texfi"), concerning possible employment with that company. At all pertinent times herein, Texfi, which was headquartered in Greensboro, North Carolina, was principally *83 in the business of designing, producing and selling knitted, woven and printed apparel fabrics produced primarily from textured polyester yarn. For several years prior to petitioner's employment negotiations with Texfi, the market price of the company's common stock had been steadily increasing, and the company had been expanding rapidly. By letter to petitioner dated July 31, 1971, Hamilton offered petitioner a position as vice-president and chief financial officer of Texfi in exchange for an annual compensation of $70,000 for the first two years of his employment. Since that salary, which was the maximum that could be offered by Texfi within its then-effective executive compensation range, was alone insufficient to attract petitioner from his position at Price, Waterhouse & Company, additional inducements were provided. First, pursuant to the July 31, 1971 letter, as soon as practicable after his becoming an employee, Texfi would grant to petitioner an option to purchase, at fair market value on the date of such grant, 10,000 shares of common stock in Texfi pursuant to the company's "Employee Qualified Stock Option Plan" (hereinafter referred to as "ESOP"). Second, Hamilton *84 agreed to personally sell to petitioner 7,500 shares of his own common stock in Texfi for $34 per share, conditioned upon petitioner: (1) Representing that he was purchasing Hamilton's Texfi shares for investment, and not with a view toward distribution or resale thereof (hereinafter referred to as "investment warrant"); and (2) agreeing to transmit to Hamilton either 100 percent of the profits from his sale of such shares in the event that petitioner voluntarily left Texfi within his first year of employment or was terminated by Texfi for certain willful misconduct within his first three years of employment, or 50 percent of the profits from his sale of such shares in the event that petitioner voluntarily left Texfi within the second or third years of his employment (hereinafter referred to as "shares profits agreement"). The July 31, 1971 letter also recited Hamilton's offer, in general terms, to personally assist petitioner in financing his acquisition of Hamilton's Texfi shares. Hamilton's agreement to sell to petitioner both the ESOP shares and a portion of his own stock holdings in Texfi was consistent with his philosophy that the textile business was an entrepreneurial business, *85 making it important that top management have an ownership stake in the company. At that time, it was expected both by Hamilton and petitioner that the market price of Texfi's stock would continue its pattern of steady growth, and that petitioner would eventually sell at a profit the shares sold to him by Hamilton, using the proceeds thereof, at least in part, to exercise his options to purchase stock under Texfi's ESOP. On August 10, 1971, petitioner and Hamilton entered into two successive contracts as follows: (1) A letter directed to petitioner from Hamilton, on behalf of Texfi, signed by both parties, providing that petitioner would enter into an employment agreement with Texfi on or before November 1, 1971, and setting forth terms of an option for petitioner to purchase stock pursuant to Texfi's ESOP; and (2) a letter directed to Hamilton personally from petitioner, signed by both parties, renewing the agreement to sell petitioner 7,500 of Hamilton's own shares in Texfi at a purchase price of $34 per share, and revising those terms of the July 31, 1971 letter and the initial August 10, 1971 contract which related to petitioner's option to purchase stock pursuant to Texfi's *86 ESOP. Included in the second August 10, 1971 contract, but pertaining solely to petitioner's prospective purchase of Hamilton's shares, were petitioner's investment warrant and shares profits agreement, together with his agreement not to sell or transfer the shares in the absence of either an effective registration statement therefor pursuant to applicable Federal securities requirements, or an opinion of counsel that such registration was not required (hereinafter referred to as "registration agreement"). On October 1, 1971, petitioner and Hamilton executed an employment agreement, providing that petitioner would serve as Texfi's chief financial officer for a term beginning on October 1, 1971, and ending on October 31, 1974, in exchange for a minimum compensation of $72,500 annually, consisting of a $60,000 base annual salary plus bonuses. The contract stated that it contained the "entire agreement" between Texfi and petitioner, and that it could be changed only by written agreement of the parties. The employment agreement made no reference to petitioner's prospective acquisition of common stock in Texfi. Pursuant to the employment agreement, petitioner commenced employment *87 as chief financial officer at Texfi in October 1971. Thereafter, at a time not disclosed in this record, petitioner was appointed executive vice-president and chief administrative officer of Texfi, and in March 1972, he was elected to Texfi's board of directors. At the time of his commencement of employment, petitioner had investigated Texfi and had determined that the growth prospects of the company were "very good." Subsequent to petitioner's commencement of employment at Texfi, however, the market value of Texfi's common stock declined. In response to this decline, by letter directed from petitioner to Hamilton, dated March 29, 1972, and signed by both parties, petitioner and Hamilton entered into a new contract, canceling their prior personal contract of August 10, 1971. In entering into the new contract, at a time when petitioner was already employed by Texfi, Hamilton was motivated by his continuing philosophy that top management of Texfi should possess an ownership stake in the company. It was petitioner's expectation, in entering into the new contract in March 1972, that the depressed value of Texfi stock would thereafter increase, and that he would subsequently sell *88 the stock at a profit, realizing a capital gain thereon. Under the new contract, Hamilton agreed to sell 10,000 of his own shares in Texfi to petitioner on or before March 31, 1972, for a purchase price of $18 per share. Like its predecessor agreement, the new contract included an investment warrant, registration agreement, and shares profits agreement relating to petitioner's prospective acquisition of Hamilton's 10,000 Texfi shares, providing as follows: 2. I hereby represent and warrant that I intend to purchase the Shares for investment and not with a view to, or any present intention of, selling or otherwise distributing any of the Shares. I agree that I will not sell or otherwise transfer the Shares in the absence of an effective registration statement for the Shares under the Securities Act of 1933, as amended, or an opinion of counsel satisfactory to you and such other assurances as you may reasonably request prior to the proposed transaction that registration is not required under said Act. I further represent that as the Company's principal financial officer, I have access to all financial information relating to the Company and my purchase of the Shares is made on *89 the basis of my own independent investigation of the business and financial condition of the Company and not upon any express or implied representations and warranties made by you or any of the Company's other officers, directors or stockholders. 3. If I voluntarily leave the employ of the Company one year or less from the date my employment with the Company Commenced, or if my employment is terminated by the Company within three years of commencement of such employment for wilful misconduct in connection with the performance of my duties and obligations to the Company, I will deliver to you my total profits from the sale of Shares immediately upon the sale thereof, which shall be no later than five years from the date hereof. If I voluntarily leave the employ of the Company more than one year but less than three years after my employment commenced, I will deliver to you 50% of my total profits from the sale of the Shares immediately upon the sale thereof, which shall be no later than five years from the date hereof. In no other event will you be entitled to any profits from the sale of the Shares. 4. There will be imposed upon the certificate or certificates issued to me *90 evidencing the Shares the following legend: "The shares evidenced by this Certificate have not been registered under the Securities Act of 1933, as amended. The shares evidenced hereby may not be sold, transferred, pledged, or hypothecated in the absence of an effective registration statement for the shares under the Securities Act of 1933, as amended, or an opinion of counsel satisfactory to the Corporation prior to the proposed transaction that registration is not required under said Act." The registration agreement and investment warrant were included in the contract because the parties thereto believed: (1) That Hamilton could not sell his shares to petitioner without either registering them with the Securities and Exchange Commission, or selling them in a transaction exempted from registration; (2) that registration would be costly; and (3) that provision of an investment warrant was the standard procedure for obtaining an exemption from registration. The new contract made no provision with respect to petitioner's entitlement to acquire shares under Texfi's ESOP. Pursuant to the March 29, 1972 agreement, the total purchase price for 10,000 shares of Hamilton's common *91 stock in Texfi, $180,000, was to be due and payable upon delivery of the shares to petitioner. In addition, the new agreement contained the following provision, addressing petitioner's possible need for Hamilton's financial assistance: 5. It may be necessary for me to request assistance from you in the form of a guaranty from you to my lender in connection with financing the purchase price of the Shares. In such event I agree not to pledge or otherwise encumber any of the Shares without your prior written consent so long as any indebtedness of mine is guaranteed as to payment or collection by you, and that, upon any sale of any of the Shares, I will immediately apply the entire proceeds, or such portion thereof as is required, to pay in full any indebtedness of mine guaranteed by you. You may instruct the Company and the transfer agent for its common stock not to transfer the Shares otherwise than as permitted by this agreement. Pursuant to this contract, on or about March 31, 1972, petitioner purchased from Hamilton, 10,000 restricted shares of Texfi common stock at $18 per share, a price below the value of unrestricted shares of Texfi on the New York Stock Exchange on the *92 purchase date. [2] This record does not disclose, however, how the purchase price paid by petitioner would compare with the fair market value of similarly restricted shares of Texfi on the same date. The stock was purchased with the proceeds of a loan which petitioner obtained on April 11, 1972 from North Carolina National Bank (hereinafter referred to as "NCNB"), and which was personally guaranteed by Hamilton. The stock certificate evidencing these shares was transmitted to NCNB as collateral for the loan. At no time did petitioner make an election to include *93 any amount in his gross income with respect to his purchase of these 10,000 shares of Texfi stock, pursuant to section 83(b). On April 22, 1975, Texfi granted to petitioner an option to purchase 12,500 shares of Texfi's common stock, pursuant to its ESOP, at a price of $5.50 per share. This option was exercisable at any time prior to three months following termination of petitioner's employment with Texfi. Following petitioner's purchase in March 1972 of Hamilton's Texfi shares, Texfi's stock unevenly increased in value until the end of 1972, when it began to decline in value steadily, a trend which continued generally through 1976. For calendar years 1970 through 1976, the yearly high and low prices paid for publicly traded shares of Texfi stock were as follows: Year
High
Low
1970
56
15 1/2
1971
67 1/2
27 3/4
1972
35 1/8
19 1/4
1973
31 1/8
7 3/8
1974
13 3/4
2 5/8
1975
8 1/2
2 3/4
1976
9 5/8
3
From October 1971 through March 15, 1976, petitioner served continuously as an officer of Texfi. Effective on March 16, 1976, petitioner resigned as an officer and director of Texfi, but agreed with the company to stay on for up *94 to one year in a "leave-of-absence" status. The contract to thus retain petitioner, dated March 24, 1976, provides, inter alia, for agreed compensation and for establishment of December 11, 1976 as the date for exercise of options held by petitioner to purchase Texfi shares [3] pursuant to the company's ESOP. In a subsequent undated letter to Hamilton, petitioner added that it was his intention, in the event that he exercised such stock options, within 60 days thereafter, to sell the stock and apply all proceeds thereof in excess of the option price to reduce his indebtedness to NCNB. As a result of the diminished value of Texfi stock in December 1976, when his options were exercisable, however, petitioner never exercised any of his options to purchase stock under Texfi's ESOP. The restrictions of the agreement of March 29, 1972, paragraph 3, concerning the disposition of any *95 profits from the sale of petitioner's Texfi stock if he should leave the company, lapsed by their own terms not later than October 1, 1974. By letter dated March 19, 1976, indicating his intention to sell the 10,000 shares of Texfi purchased from Hamilton, and to apply the sale proceeds to reduce his indebtedness to NCNB, petitioner requested that NCNB release the stock certificate evidencing such shares, and permit the sale to occur. On March 26, 1976, [4] in an "attempt to cut [his] losses," petitioner sold on the New York Stock Exchange for $74,092.08, the shares in Texfi which he had acquired from Hamilton in March 1972 for $180,000. Consistent with his March 29, 1972 contract with Hamilton, and his March 19, 1976 letter to NCNB, petitioner applied the full proceeds of the sale to a reduction of his outstanding indebtedness to NCNB. Between 1972 and 1976, *96 petitioners reported no income with respect to these 10,000 Texfi shares, except for dividends received with respect thereto. On their joint Federal tax return for tax year 1976, petitioners claimed an ordinary loss deduction in the amount of $105,908, computed as the difference between the price at which petitioner purchased the shares, $180,000, and the price at which he sold the shares, $74,092.08, rounded to the nearest dollar, and identified on such return as a: Loss under section 165(c)(2) in connection with disposition of equity interest as part of employment contract with Texfi Industries, Inc. terminated in March, 1976. Upon audit, respondent disagreed with this position, and determined that petitioners' loss on the sale of the Texfi stock was a long-term capital loss, as to which only $1,000 was allowable as a deduction in 1976. ULTIMATE FINDINGS OF FACT The 10,000 shares of common stock in Texfi were transferred to petitioner inconnection with his performance of services for Texfi. Petitioner's primary and predominant motive for purchasing the stock of Texfi was for purposes of investment. OPINION Issue 1. Deductibility Under Section 165.
The first *97 issue presented herein is whether petitioners' $105,908 loss on their sale of 10,000 shares of common stock in Texfi may be deducted as an ordinary loss pursuant to section 165. Section 165(a) states the general rule allowing a deduction for uncompensated losses incurred within the taxable year. Section 165(c) limits this general rule, in the case of individual taxpayers, so as to permit deductions only for losses incurred in a trade or business, a profit-making activity, or a theft or casualty. Losses from the sale of a capital asset are further governed by section 165(f), which adopts the limitations on deductions set forth in sections 1211 and 1212. Resolution of the first issue herein therefore depends upon whether the 10,000 Texfi shares acquired and held by petitioner constituted a capital asset in his hands. Section 1221 defines "capital asset" expansively as property held by the taxpayer, with the exception of five categories of property. It is uncontroverted that the 10,000 shares of Texfi stock at issue do not fit within any of these excepted categories. At the same time, however, it is well-established that an asset outside the literal language of these excepted *98 categories may nonetheless be held to be excepted from definition as a capital asset. In Corn Products Refining Co. v. Commissioner,350 U.S. 46 (1955), the Supreme Court, in holding that corn futures contracts bought and sold by the taxpayer were not capital assets in his hands, stated: Admittedly, petitioner's corn futures do not come within the literal language of the exclusions set out in [section 117(a)]. [5] They were not stock in trade, actual inventory, property held for sale to customers or depreciable property used in a trade or business. But the capital-asset provision of § 117 must not be so broadly applied as to defeat rather than further the purpose of Congress. Burnet v. Harmel,287 U.S. 103, 108. Congress intended that profits and losses arising from the everyday operation of a business be considered as ordinary income or loss rather than capital gain or loss. The preferential treatment provided by § 117 applies to transactions in property which are not the normal source of business income. * * * Since this section is an exception from the normal tax requirements of the Internal Revenue Code, the definition of a capital asset *99 must be narrowly applied and its exclusions interpreted broadly. [350 U.S. at 51-52] The Corn Products doctrine has since been applied by this Court to other types of assets, including corporate securities. See W. w. Windle Co. v. Commissioner,65 T.C. 694, 707-708 (1976), appeal dismissed 550 F.2d 43 (1st Cir. 1977), cert. denied 431 U.S. 966 (1977), and cases cited therein. To determine whether corporate stock had been acquired by the taxpayer for a purpose so integrally related to his trade or business that such stock would be excepted from definition as a capital asset, this Court in Windle, based upon a comprehensive analysis of judicial precedent on this issue, adopted a test, pursuant to which the existence of a substantial investment motive in a predominantly business-motivated acquisition and retention of corporate stock, will be sufficient to render such stock a capital asset under section 1221. 65 T.C. at 712. See also Hollingworth v. Commissioner,71 T.C. 580 (1979); Miller v. Commissioner,70 T.C. 448 (1978); *100 Continental Illinois National Bank v. Commissioner,69 T.C. 357 (1977). As noted by this Court in Windle, "stock is normally a capital asset" owned for investment purposes, and only where the "original purpose of [the] acquisition and the reason for continued retention are both devoid of substantial investment intent should the stock be treated otherwise." 65 T.C. at 714, n. 15. In accordance with the Windle test, to obtain ordinary loss treatment under section 165 on the sale of the Texfi stock at issue herein, petitioners have the burden of proving the absence of a substantial investment motive in petitioner's purchase and retention of the stock. Welch v. Helvering,290 U.S. 111, 115 (1933); Rule 142(a). In evaluating petitioner's motivations in light of the foregoing test, we face an essentially factual inquiry. Corn Products Refining Co. v. Commissioner,supra at 51; Hollingsworth v. Commissioner,supra at 585. In support of their contention that the subject shares of stock were purchased and held in a business-motivated, rather than an investment-motivated transaction, petitioners *101 rely upon the following: (1) While petitioner was not required to purchase Texfi stock when he was first employed by the company, it was Texfi's policy that high-level management should have a stake in the company, placing him under pressure to acquire its stock when he became a director of Texfi in March 1972; (2) at the time of his stock purchase, Texfi stock had declined repidly in value, and did not appear to petitioner to be a wise investment; (3) restrictions on petitioner's alienation of the stock were exemplary of a business-motivated, rather than an investment-motivated transaction; and (4) petitioner had no history of stock investments prior to his purchase of the subject shares in Texfi, and the price of that stock was in excess of his net worth at the time of purchase. On the basis of the full record herein, including testimony by petitioner and Hamilton at trial, we conclude that petitioner purchased the subject shares of Texfi stock with a substantial investment intent.Such intent consisted of petitioner's expectation that the stock would appreciate in value, enabling him to subsequently sell the stock at a profit, realizing a capital gain thereon. This expectation *102 motivated petitioner's initial agreements to purchase the stock in July 1971 and August 1971, as well as his subsequent purchase of the stock, on renegotiated terms, in March 1972. We further conclude that the substantial investment intent which characterized petitioner's acquisition of the stock, prevailed throughout the period he held the stock, thus negating ordinary loss treatment under section 165 in conformance with the test applied by this Court in Windle.
In 1971, after "many months interviewing and looking for an individual to become the chief financial officer" at Texfi, Hamilton concluded that petitioner was the "outstanding leading candidate" for the position. Since the salary offered by Texfi was alone insufficient to attract petitioner from his position as a partner at Price Waterhouse & Company, as a further inducement, Hamilton offered to sell to petitioner a portion of his own stock holdings in Texfi.According to Hamilton's testimony, the offer to sell his own stock was "the only way that I could…. get [petitioner] to come into the company." At the time of the employment negotiations between petitioner and Himilton, the market value of Texfi's common *103 stock had been steadily increasing, and the Company had been expanding rapidly. It was expected, both by petitioner and Hamilton, that the stock would continue its pattern of steady growth, and that petitioner would eventually sell the shares sold to him by Hamilton at a profit, applying the proceeds thereof to the purchase of stock pursuant to Texfi's ESOP. Subsequent to petitioner's commencement of employment at Texfi, in October 1971, the market value of Texfi stock declined. As a result, petitioner refrained from purchasing Hamilton's shares at the $34 per share agreed price under the August 10, 1971 contract, and on March 29, 1972 petitioner negotiated a new contract with Hamilton which included new price and quantity terms for the stock purchase. Pursuant to the new contract, on or about March 31, 1972, petitioner purchased from Hamilton, 10,000 shares of Texfi stock at $18 per share. Petitioner testified that in March 1972, at the time he purchased Hamilton's shares, he evaluated the possible tax consequences of a latter sale of the stock. Based upon this evaluation, petitioner testified that he concluded, with certitude, that he would realize a capital gain upon his *104 subsequent sale of the shares. The Texfi stock purchased by petitioner from Hamilton increased in value, albeit unevenly, between March 1972, when petitioner purchased it, and the last quarter of 1972, but it began to decline steadily on the market thereafter. Nevertheless, "[t]his intent to realize a profit through the eventual sale of the property is indicative of an investment motive." Miller v. Commissioner,supra at 456. Petitioner also testified that he did not intend to accept the economic risks of a decline in the value of the Texfi stock, expecting instead that Texfi would "make [him] clean" upon his termination of service for any losses resulting from such a decline.While this expectation proved incorrect, petitioner's intended participation in such a "no-risk situation" is similarly indicative of an investment intent. Hollingsworth v. Commissioner,supra at 586. Indeed, petitioner apparently recognized this, since he testified as follows: I was brought in and recruited in a very aggresive recruiting effort to help bring this company under financial control, and I did not view that I was taking what I would call a risk. *105 I guess that goes along with making an investment, but * * * I did not have the equity [sic] to make that kind of an investment on my own. That the foregoing indications of investment intent were present when petitioner acquired Hamilton's shares is clearly disclosed, therefore, by petitioner's own testimony, and there is no evidence indicating any alteration of that intent during the four-year holding period preceding petitioner's March 1976 disposition of the stock. Consistent with a finding of such investment intent, the investment warrants executed by petitioner, and included both as a legend on the face of the shares certificate and in each successive contract relating to petitioner's purchase of Hamilton's shares, provided that petitioner was purchasing such shares for investment, and not with a view toward resale.While we are mindful that petitioner and Hamilton believed that inclusion of the investment warrant would facilitate acquisition of an exemption from registration under Federal securities laws, we have no reason on this record to doubt the verity of the commitments reflected in such warrant. Neither can the absence of a substantial investment intent be inferred *106 from the price petitioner paid Hamilton for his 10,000 shares of common stock in Texfi. This Court has held that payment for stock at a price inexcess of market value may indicate that the stock was not acquired for investment purposes since "[s]uch premium makes it more unlikely that an eventual profit will be made upon resale and indicates a special need for the stock not shared with other investors." Miller v. Commissioner,supra at 456. See also Dearborn Company v. United States,444 F.2d 1145, 1167 (Ct. Cl. 1971). There is no indication on this record that petitioner paid Hamilton a premium price for his 10,000 Texfi shares. Citing solely a Memorandum Opinion of this Court in Hirsch v. Commissioner,T.C. Memo. 1971-235, petitioners suggest, first, that the Texfi policy that high-level management should have an ownership stake in the company placed petitioner under pressure to purchase Hamilton's Texfi stock in March 1972, after he had become a director of the company, establishing a business purpose for the stock purchase. In this regard, petitioners suggest only that such Texfi policy placed "pressure" upon *107 petitioner, and not that he was compelled thereby to purchase the stock. Assuming that this professed motivation, however, was a factor in petitioner's purchase of Hamilton's stock in March 1972, it does not negate the demonstrated coexistence of substantial investment interests, reflected in petitioner's expectation that the stock purchase would be a profitable and low-risk undertaking, and confirmed by his own warrant of investment intent. Further, petitioners' reliance upon Hirsch is misplaced. First, the Hirsch holding is based upon the primary or predominant motivation test. This test was rejected by this Court in Windle in favor of the substantial investment motivation test. Second, the taxpayer in Hirsch was required, as an explicit precondition of employment, to purchase stock and make loans to his corporate employer so as to assist the company in its expansion plans. Such equity and loan payments were required for the company's expansion, an expansion which was to provide the need for the taxpayer's services. The taxpayer in Hirsch acceded to this procondition because of his own increasingly distressed financial condition. Comparable evidence of *108 business and/or taxpayer necessity is absent herein. Third, unlike the taxpayer in Hirsch, whose payments were required by his employer for expansion, petitioner's payment directly enriched the seller, Hamilton, rather than his employer, Texfi. Petitioners next maintain that at the time petitioner purchased Hamilton's shares, the market performance of unrestricted Texfi stock rendered Hamilton's stock a manifestly unwise investment. The fact that the market value of Texfi's unrestricted stock dropped between the date petitioner commenced his employment and his March 1972 stock purchase, however, is not determinative of the wisdom of such purchase. Petitioner purchased the stock for $18 per share. During March 1972, the value of unrestricted shares of Texfi stock on the New York Stock Exchange ranged from a low of over $22 per share to a high of over $26 per share. Significantly, petitioner testified that at the time of his stock purchase, he anticipated that the market value of unrestricted Texfi stock would thereafter increase. By November 1972, the market value of unrestricted Texfi stock had indeed increased, albeit unevenly, to a high of over $33 per share. On these *109 facts, we cannot infer that petitioner, or any prudent investor, would have regarded the purchase of Texfi stock as a manifestly unwise investment in March 1972. According to petitioners' third argument, various "complexities, restrictions, and risk[s]," associated with his March 1972 purchase of Hamilton's 10,000 shares in Texfi made the transaction a "highly unusual and speculative 'investment'," suggesting instead a business motivation therefor. In support of this proposition, petitioners allude to several characteristics of the stock purchase transaction which allegedly restricted petitioner's alienation of the 10,000 shares, as follows: (1) Federal securities laws restrictions; (2) Texfi's policy for top management to have a stake in the company; (3) petitioner's contractual commitment to apply the entire proceeds from a sale of the shares to a reduction of any remaining indebtedness to NCNB; and (4) Hamilton's purported control, as guarantor of petitioner's NCNB loan, over when the loan could be called and the collateral sold. We are not convinced that any of the foregoing "complexitites, restrictions, and risk[s]" would have caused petitioner to conclude that Hamilton's *110 10,000 Texfi shares constituted an unwise or highly unusual investment in March 1972.We have already found that petitioner's response to applicable Federal security laws was to enter into an explicit declaration of his investment intent in purchasing Hamilton's stock. We have also found that nothing in Texfi's policy that top management have a stake in the company was inconsistent with an investment intent. Nor, is light of petitioner's admission that he expected to sell the stock acquired from Hamilton at a profit, are we persuaded that the requirement to apply the proceeds of such a sale to a reduction of his indebtedness to NCNB, constituted any significant investment disincentive in March 1972. Such a requirement is normal banking practice in the circumstances, where a borrower seeks to sell collateral securing a loan. Petitioners have similarly failed to demonstrate why the terms of Hamilton's guaranty of the NCNB loan negated the existence of a substantial investment motive. It is clear that the fact that an acquisition of property is fully leveraged, as in this case, does not alone negate the existence of a substantial investment motivation. Hollingsworth v. Commissioner,supra at 586. *111 Further, this record does not support petitioners' contentions that Hamilton controlled the timing of either NCNB's authority to call the loan or the sale of the Texfi stock.Petitioner committed only not to pledge or otherwise encumber such stock without his guarantor's prior consent, and to apply the entire proceeds from any sale of the stock to pay in full any remaining indebtedness guaranteed by Hamilton. We find nothing in these terms to suggest the business motivation contended for. It is argued, finally, that petitioners' insufficient net worth to undertake the purchase of Hamilton's shares, without assistance, and lack of experience in making stock investments, suggested that petitioner did not believe that he was making an investment in March 1972. Prior to 1971, according to petitioner's testimony, he had made no stock investments of any consequence. We recognize that such an absence of investment experience can be probative of a taxpayer's business intent. Cf. Miller v. Commissioner,supra at 458. Petitioner also testified, however, that he had historically refrained from stock investments, since in his position as a partner at Price, Waterhouse *112 & Company, "it was not a practical way to build an equity." The stock purchase at issue here occurred in March 1972, at which time petitioner was employed in an executive capacity at Texfi. There is no evidence that the considerations of professional practicality that apparenty inhibited petitioner's investment in the stock market prior to the date he commenced employment with Texfi, continued to influence him after that date. Nor do we believe that petitioner's insufficient net worth was inconsistent with his intent to invest in Hamilton's Texfi stock. Petitioner, who served as vice president, director and chief financial officer of Texfi, concluded in March 1972 that the stock of his employer would rise in value. Notwithstanding any constraints resulting from his own net worth, Hamilton's assistance in obtaining the NCNB loan enabled petitioner to avail himself of an apparently attractive investment opportunity. Pursuant to the prevailing Windle test, described supra, the existence of a substantial investment motive in a predominantly business-motivated acquisition and holding of corporate stock, will render such stock a capital asset under section 1221. On this *113 record, we do not doubt that petitioner was motivated to purchase and hold the shares of stock at issue, in part, for reasons relating to his business relationship with Texfi. We conclude, however, that the record demonstrates the coexistence of a substantial, and indeed predominant, investment intent, thus rendering the subject stock a capital asset under section 1221, and vitiating ordinary loss treatment under section 165. [6]
*114 Issue 2. Deductibility Under Section 83
In accordance with sections 64 and 65, respectively, gain or loss will not be treated as deriving from the sale or exchange of a capital asset where it is considered as ordinary gain or loss pursuant to other provisions of Subtitle A of the Code, such as section 83. The next issue presented herein relates to petitioners' claim that the loss sustained on petitioner's sale on March 26, 1976, of the 10,000 shares of Texfi common stock purchased from Hamilton in March 1972, is deductible as an ordinary loss pursuant to section 83(a) and section 1.83-1(b)(2), Income Tax Regs.
Section 83(a) provides, in pertinent part, that where property is transferred to a person "in connection with the performance of services," the excess of the fair market value of such property, determined without regard to any restrictions other than a restriction which by its terms will never lapse, over the amount paid for the property, shall be included in the gross income of the person who performed such services, measured at such time as the rights of the person holding the beneficial interest in the property are either transferable or not subject to a substantial *115 risk of forfeiture. Although property transferred subject to forfeiture and transferability restrictions is generally taxed to the performer of services when these restrictions lapse, section 83(b) provides for an election to accelerate the taxable event to the time of transfer. It has been stipulated herein, and we have found, that petitioners did not make the section 83(b) election with respect to the Texfi stock at issue. It has also been stipulated by the parties, and we have found, that petitioner did not report on his Federal income tax returns for the years 1972 through 1976, any income with respect to such Texfi stock, except for dividends received relating thereto. The first matter to be resolved herein is the threshold issue whether Hamilton's sale of stock to petitioner constituted a transfer of property "in connection with the performance of services" within the meaning of section 83. In this inquiry, we are guided by the recent decision of this Court in Alves v. Commissioner,79 T.C. 864 (1982), on appeal (9th Cir. June 24, 1983). In Alves, we found "clear indication" that the stock at issue therein was transferred in connection with the *116 performance of services under section 83 in the facts that the stock was transferred to provide the transferee employee with an additional interest in the company, and that the stock purchase agreement called for repurchase of the stock by the company in the event the employee left the company within a specified period of time.The latter provision was designed "to provide some assurance that key personnel would remain with the company a number of years." Alves v. Commissioner,supra at 873. Indications of a transfer qualifying under section 83, comparable to those identified in Alves, are found in this case in Hamilton's interest in seeing petitioner acquire a proprietary stake in Texfi, and in the shares profits agreement, entered into by Hamilton and petitioner in March 1972. While we have found herein that petitioner purchased Hamilton's Texfi stock, with restrictions, at a price below the fair market value of unrestricted shares of Texfi on the same date, this record does not disclose whether petitioner's purchase price for such stock was below the fair market value of similarly restricted shares on that date. In any event, restricted stock will not *117 fail to be considered as transferred in connection with the performance of services, and section 83(a) will not be held inapplicable, solely because such stock was transferred in an exchange for an amount equal to its fair market value, as restricted, rather than in a bargain sale. Alves v. Commissioner,supra at 877-878. We note, finally, that neither the fact that the Texfi stock was transferred to petitioner with respect to his future services, Alves v. Commissioner,supra at 875, section 1.83-3(f), Income Tax Regs., nor the fact that the Texfi stock was transferred to petitioner, not by Texfi, but by its President and shareholder, Hamilton, will affect the applicability of section 83. [7]
*118 On the basis of this record, and in light of the principles established by this Court in Alves, we conclude that the 10,000 shares of stock of Texfi at issue were transferred to petitioner in connection with his performance of services for Texfi under section 83. While both petitioners and respondent are in accord with this threshold determination under section 83, it is at this point that their analytical paths diverge. Petitioners offer two alternative theories in support of their contention for ordinary loss treatment under section 83 and the regulations thereunder. First, according to petitioners, pursuant to section 1.83-1(b)(2), Income Tax Regs., the 10,000 shares of Texfi stock at issue were forfeited by petitioner while still substantially nonvested in his hands, giving rise to an ordinary loss in the amount of the difference between the purchase price of the stock and the amount received by petitioner upon such forfeiture. Second, petitioners apparently maintain that even if such stock became substantially vested in petitioner's hands on October 1, 1974, when the restrictions stated in the shares profits agreement in petitioner's March 29, 1972 contract with Hamilton *119 expired, petitioners were entitled to an ordinary loss deduction in 1974 in the amount of the difference between petitiner's purchase price for the stock and the fair market value of the stock on October 1, 1974, and the character of that loss remained unchanged between October 1, 1974 and petitioner's sale of the stock in March 1976. With respect to petitioners' first argument, respondent answers that, for two reasons, section 1.83-1(b)(2), Income Tax Regs., is inapplicable to the transaction at issue here. First, according to respondent, petitioner disposed of the Texfi stock in a non-qualifying sale transaction, rather than a "forfeiture" which would qualify under section 1.83-1(b)(2), Income Tax Regs. Second, although respondent agrees that the Texfi stock was acquired by petitioner in a transaction which was "in connection with the performance of services" by petitioner, respondent states that the stock was substantially vested when petitioner disposed of it in March 1976. In answer to petitioners' alternative argument, respondent maintains that neither section 83 nor any other provision of the Internal Revenue Code, would permit petitioners to defer until 1976 the recognition *120 of a loss on the sale of stock which petitioners allegedly incurred in 1974. Section 1.83-1(b)(2), Income Tax Regs., relied upon by petitioners, provides as follows: If substantially nonvested property that has been transferred in connection with the performance of services to the person performing such services is forfeited while still substantially nonvested and held by such person, the difference between the amount paid (if any) and the amount received upon forfeiture (if any) shall be treated as an ordinary gain or loss. This paragraph (b)(2) does not apply to property to which § 1.83-2(a) applies. This regulation will therefore apply only in the event of a forfeiture of substantiallynonvested property in the hands of the service-performing transferee of such property. Petitioners, however, have failed to demonstrate that the 10,000 shares of Texfi stock purchased from Hamilton were at any time "forfeited" while in petitioner's hands. Rather, the parties herein have stipulated that "[o]n March 26, 1976, petitioner sold the 10,000 shares of common stock of Texfi * * * for $74,092.08," [Emphasis added.] Petitioner further indicated that the *121 "sale" of the stock in 1976 was an "attempt to cut [his] losses." It is clear on this record that petitioner's sale of Texfi stock in March 1976 was a wholly volitional and self-directed transaction, which was effectuated, for fair market value, in an arm's-length transaction on the New York Stock Exchange. The treatment of substantially nonvested property that has been dold in an arm's-length transaction is governed, not by section 1.83-1(b)(2), Income Tax Regs., but by section 1.83-1(b)(1), which provides, in pertinent part, as follows: If substantially nonvested property (that has been transferred in connection with the performance of services) is subsequently sold or otherwise disposed of to a third party in an arm's-length transaction while still substantially nonvested, the person who performed such services shall realize compensation in an amount equal to the excess of -- (i) The amount realized on such sale or other disposition, over (ii) The amount (if any) paid for such property. * * * In addition, section 83(a) * * * shall thereafter cease to apply with respect to such property. Even assuming (without holding) that Hamilton's Texfi stock was substantially *122 nonvested property in March 1976, petitioner's arm's-length sale of the stock at that time would have been governed by section 1.83-1(b)(1), which does not address sales at a loss, and which would be ineffective to authorize the ordinary loss contended for. Petitioners' alternative contention under section 83 apparently stems from respondent's suggestion that even if the shares profits agreement in petitioner's March 29, 1972 contract for purchase of the subject shares constituted a substantial risk of forfeiture, such risk lapsed, pursuant to the contract, three years following petitioner's commencement of employment at Texfi, or in October 1974. If section 83 would have authorized an ordinary loss in 1974 when this assumed risk of forfeiture lapsed, according to petitioners, nothing intervened to transform the character of that loss into a capital loss upon petitioner's disposition of the stock in March 1976. In the absence of a forfeiture, however, petitioners have failed to identify any provision of section 83 which would have authorized them to recognize an ordinary loss in 1974 with respect to the Texfi stock. [8] To the contrary, assuming that the shares profits agreement *123 engendered a substantial risk of forfeiture, section 83(a) would have operated only to tax, as compensatory ordinary income upon the lapse of the restriction in 1974, at the time such substantial risk ceased, "the excess of - the fair market value of such property" in 1974 over "the amount (if any) paid for such property." Given the absence of such an excess, resulting from the depressed value of Texfi stock in 1974, petitioners recognized no ordinary income in that year. No event occurred in 1974 which gave rise to any recognizable loss; the fact that the stock may have been worth less when the contract restrictions expired than its value when petitioner bought it was not such an event, and petition continued to own the stock for two years thereafter. When petitioner's arm's-length sale of the property occurred in 1976 the character and timing of his gain or loss was controlled by other provisions of the Code, the effects of which are fully examined in our consideration of petitioners' contentions for deductibility under section 165, supra.
*124 On this record, we hold that the common stock in Texfi was acquired and held by petitioner as a capital asset, and petitioners are not entitled to an ordinary loss deduction on the sale of such stock under either section 165 or section 83. To reflect the foregoing, as well as those issues which have been conceded, Decision will be entered for the respondent.
Footnotes
1. All statutory references herein are to sections of the Internal Revenue Code of 1954, as amended and in effect for the years in issue, and all references to the Rules are to the Tax Court Rules of Practice and Procedure, unless otherwise stated.↩
2. While petitioner's brief and personal notes, entered into evidence, suggest that the shares were purchased at "market value," Hamilton testified, the Standard & Poor's Corp.'s "ISL Daily Stock Price Index", entered into evidence herein, confirms, and we find, that petitioner's purchase price was below the value of unrestricted shares of Texfi on the New York Stock Exchange on March 29, 1972, and March 30, 1972. According to such Index, March 31, 1972, was a holiday on the New York Stock Exchange. In the month of March 1972, the price range for Texfi shares on the New York Stock Exchange was between $22+ and $26+.↩
3. The December 11, 1976 option exercise date applied not only to the option to purchase 12,500 shares dated April 22, 1975, described herein, but also to two subsequent options, both dated October 27, 1975, to purchase 1,210 shares and 1,482 shares under Texfi's ESOP, at a price of $6.125 per share.↩
4. While a letter in this record to petitioner from his stockbroker suggests that the 10,000 Texfi shares at issue were sold on March 19, 1976, both the stipulation of facts by the parties and the stockbroker's statement, also in this record, are in accord, and we find, that the shares were sold on March 26, 1976.↩
5. Sec. 117(a) of the 1939 Code was the predecessor of sec. 1221.↩
6. In lieu of the Windle test, petitioners contend for, and respondent concedes, application herein of the test reflected in Rev. Rul. 75-13, 1975-1 C.B. 67, whereby the sale or exchange of shares of stock will give rise to ordinary gain or loss if business is the predominant motive for purchasing and holding the stock. While, on the strength of Windle and a Memorandum Opinion of this Court, Bell Fibre Products Corp. v. Commissioner,T.C. Memo. 1977-42, Rev. Rul. 75-13 was prospectively revoked in 1978, Rev. Rul. 78-94, 1978-1 C.B. 58, such revocation was not to be applied adversely to taxpayers who acquired stock before March 13, 1978, and disposed of it before September 13, 1978, into which timeframe petitioners' transactions herein uncontrovertibly would fit. While we are, of course, bound to apply the carefully-considered test established by this Court in Windle,↩ we note that investment indications in this record are sufficiently pervasive that the subject stock would be a capital asset even under the alternative test contended for by petitioners.
7. Tilford v. Commissioner,75 T.C. 134 (1980), revd. 705 F.2d 828 (6th Cir. 1983), involved sales of stock by taxpayer, a principal officer and either sole or majority shareholder of Watco, Inc., to employees of the corporation in order to induce them to work for the corporation. In a court-reviewed opinion this Court held invalid sec. 1.83-6(d), Income Tax Regs., which treats such transactions as capital contributions to the corporation. In the majority opinion it was noted that: The fact that these sales were in connection with the rendering of services by the purchasers, while it may bring into play certain tax consequences to the employees and Watco under section 83, does not render the transaction any less a sale under section 1002, as far as petitioner is concerned. [75 T.C. at 145]. The Court of Appeals reversed, concluding that the regulation is consistent with both the legislative history and statutory intent of sec. 83(h). The instant case involves the tax consequences to the petition-employee and thus does not involve the issue raised in Tilford. Accordingly, we do not decide whether we agree with the Court of Appeals reversal of our Tilford↩ opinion.
8. In addition to sec. 1.83-1(b)(2), sec. 1.83-1(e)↩ provides for recognition of an ordinary loss upon certain forfeitures of substantially vested property.